IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

STEPFEN GERARD GAITHER,
*Defendant*.

CRIMINAL No. ELH-20-0284

**MEMORANDUM OPINION**

In an Indictment filed September 1, 2020 (ECF 38), defendant Stepfen Gerard Gaither was charged with murder-for-hire conspiracy (Count One); "use of interstate commerce facilities" with the intent to commit a murder (Count Two); twelve counts of conspiracy in the use of interstate communications with intent to extort (Counts Three through Fourteen); extortionate means to collect and attempt to collect an extension of credit (Count Fifteen); and possession with intent to distribute fentanyl and heroin (Count Sixteen). *Id.* Pursuant to a Plea Agreement (ECF 96), defendant entered a plea of guilty on August 31, 2021, to Counts, One, Five, and Sixteen. ECF 95. On January 6, 2022 (ECF 107), the Court sentenced defendant to a total term of 144 months of incarceration, with credit for time served since June 30, 2020. ECF 13; ECF 108.

Defendant, who is now self-represented, has filed a motion for compassionate release (ECF 115), pursuant to 18 U.S.C. § 3582(C)(1)(A)(i) (the "Motion"), along with six exhibits. The exhibits include the Warden's denial of defendant's request for a sentence reduction (ECF 115-1); medical records (ECF 115-2); defendant's disciplinary record while in the Bureau of Prisons ("BOP") (ECF 115-3); defendant's inmate education data (ECF 115-4); letters submitted by defendant's aunt and mother in support of the Motion (ECF 115-5); and letters submitted by daughters of defendant (ECF 115-6). In the Motion, defendant contends, *inter alia*, that his

medical conditions constitute an extraordinary and compelling reason for his release.  ECF 115 at 2.  Defendant has also filed a motion to expedite consideration of the Motion (ECF 128), along with a supporting memorandum (ECF 128-1) (collectively, the "Motion to Expedite").

The government opposes the Motion.  ECF 122 ("Opposition").  It also submitted seven exhibits with its Opposition.  ECF 124.  These include a copy of the Plea Agreement (ECF 124-1); defendant's sentencing transcript (ECF 124-2); a copy of defendant's BOP medical records (ECF 124-3); BOP data (ECF 124-4); letters from victims opposing defendant's release (ECF 124-5 and ECF 124-7); and the transcript of the guilty plea proceeding (ECF 124-6).  The government did not respond to the Motion to Expedite.

The Office of the Federal Public Defender has declined to supplement the Motion.  ECF 118.  Nor will it seek appointment of counsel for defendant.  *Id.*

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.  Factual and Procedural History

Defendant was charged in a Complaint on June 23, 2020 (ECF 1), with collection of credit by extortionate means, in violation of 18 U.S.C. § 894, and interstate communications with intent to extort, in violation of 18 U.S.C. § 875(b).  *Id.*  Then, on September 1, 2020, a grand jury in the District of Maryland returned a sixteen-count Indictment charging defendant and a codefendant, Clement Mercaldo, Jr., with multiple crimes.  ECF 38.[1]  Count One charged defendant with conspiracy to use interstate commerce facilities, *i.e.*, cellular telephones, with the intent to commit a murder-for-hire, in violation of 18 U.S.C. § 1958.  *Id.* at 1.  Count Two charged defendant with use of interstate commerce facilities with the intent to commit a murder-for-hire, in violation of 18

---

[1] Mercaldo unexpectedly died before his sentencing.  *See* ECF 113; ECF 114.

U.S.C. § 1958(a).  *Id.* at 2.  Counts Three through Fourteen charged defendant with transmission of interstate communications, *i.e.*, text messages, containing threats to injure, in violation of 18 U.S.C. § 875(b).  *Id.* at 3–5.  In Count Fifteen, defendant was charged with conspiracy to use extortionate means to collect or attempt to collect an extension of credit, in violation of 18 U.S.C. § 894.  *Id.* at 6.  And, Count Sixteen charged defendant with possession with intent to distribute fentanyl and heroin, in violation of 21 U.S.C. § 841(a)(1).  *Id.* at 7.[2]

As noted, pursuant to a Plea Agreement (ECF 96), defendant entered a plea of guilty to Counts One, Five, and Sixteen.  ECF 95.  Count One, the murder-for-hire conspiracy, carried a maximum ten-year term of imprisonment.  ECF 96, ¶ 5.  Count Five, interstate communications with intent to extort, carried a maximum twenty-year term of imprisonment.  *Id.*  Count Sixteen, possession with intent to distribute fentanyl and heroin, carried a mandatory minimum term of imprisonment of five years, with a maximum term of forty years.  *Id.*  Under Fed. R. Crim. P. 11(c)(1)(C), the parties stipulated to a range of 132 months to 156 months of incarceration as the appropriate disposition.  *Id.* ¶ 14.

The Plea Agreement contains a very lengthy stipulation of facts.  *See id.* ¶ 10.  According to the stipulation, the codefendant loaned over $1,000,000 to J.C., sometimes referred to as "Joe," to be repaid in monthly installments.  *Id.* at 13.  When J.C. stopped making the loan payments, Mercaldo paid defendant substantial sums of money to intimidate J.C. and K.D., J.C.'s business partner, in order to extort money.  *Id.*  The intimidation included sending anonymous text messages to J.C. and K.D. that threatened harm to them, their wives, and children.  *Id.*  The codefendant also paid defendant to vandalize J.C.'s car.  *Id.* 13, 14.  On March 28, 2019, in the middle of the night,

---

[2] The codefendant was not charged in Count Sixteen.  *See* ECF 38.

defendant used an object to smash J.C.'s car window, while the car was parked in J.C.'s driveway. *Id.* at 13.

The codefendant also paid defendant to set J.C.'s house on fire. *Id.* at 15. In the early morning hours of August 4, 2019, defendant traveled to J.C.'s home. *Id.* While J.C. and his wife were asleep inside, defendant broke a window to J.C.'s basement and ignited a flammable liquid, causing a fire. *Id.* Although no one was physically injured, the fire caused about $302,744.89 in damage to the dwelling and its contents. *Id.* at 27. J.C. and his wife had to vacate the home for eleven months because of the fire. *Id.* at 15. And, State Farm Insurance Company suffered a loss of $353,340.66 as a result. *Id.* at 27.

In the days immediately following the arson, the codefendant withdrew $1,500 cash from his bank account and gave it to defendant. *Id.* at 15. That was one of several payments to defendant. *See*, *e.g.*, *id.* at 13 (payment of $1,000 by Mercaldo to defendant, which had been withdrawn by Mercaldo from a bank); *id.* at 14 (referencing Mercaldo's withdrawal of more than $5,000 from his bank account, which he paid to Gaither).

In August and September of 2019, defendant continued to send threatening messages to J.C. and K.D. *Id.* at 15. Some of the messages stated that the victims were being followed and threatened harm to them and their families. For example, on August 30, 2019, defendant sent a message to J.C. that stated, *id.*: "Karma is a bitch when you fuck everyone over you will get fucked back a fire wasn't good enough you treat people like shit you deserve to die like shit when you die i hope you can pay everyone off you owe money to[.] [Your wife] WILL GO fast while you sit and watch and then I'll record you dying slow and send it to you [sic] kids on Facebook . . . P.S. YOUR TIME IS COMING[.]" (Footnote omitted). Defendant also sent a message to J.C. on September 3, 2019, stating: "You can hide your truck . . . but I'll always be waiting if I don't get

paid . . . you won't make it to see Christmas I'll make sure Of [sic] that[.]"  *Id.* at 16.  Then, on September 10, 2019, Gaither texted J.C., in part, *id.*: "How was your golf game yesterday I always got my eyes on u even when you not staying home . . . ."

On or around the same date, Gaither texted J.C. as follows, ECF 106 (Government Sentencing Memorandum) at 5:[3]



Defendant sent the following texts to K.D. on or about October 22, 2019, ECF 96 at 17; ECF 106 at 6:

---

[3] The screenshots and charts displaying text messages are reproduced here as they appear in the Plea Agreement (ECF 96) or the government's Sentencing Memorandum (ECF 106).



On October 26, 2019, defendant received a cash payment from K.D.  ECF 96 at 17.  He immediately used the money to purchase an Apple watch and deposited the remainder into his bank account.  *Id.*  When Mercaldo asked defendant to confirm he received the money, defendant lied and told Mercaldo that he did not receive any money from the victim.  *Id.*  Gaither then texted the codefendant: "Hey good morning you want to play dirty with them sense [sic] they think they slick[.]"  *Id.*

Beginning on October 29, 2019, the conversations between defendant and the codefendant shifted from a plot to scare the victims to a plot to retaliate against the victims for failure to make payment.  *Id.*  Defendant and Mercaldo began discussing what they referred to as "plan b": killing J.C. and/or K.D.  *Id.* at 18.  As displayed in the following text exchange, on December 31, 2019, Gaither told the codefendant that he would carry out plan b for $5,000, *id.*:

| FROM | MESSAGE |
|------|---------|
| Mercaldo | I'd really like to do a plan b on him and just be done with that fat fuck ! Are you up to that ? |
| Gaither | Your call i got nice tool [slang for a firearm] for job long as i can get insurance for being in area idc Iam tired and they don't have no ppl babysitting them no more i was pass yesterday when came back |
| Mercaldo | How much $ ? Plan b is to do away correct? |
| Gaither | Not tht much cuz u gabe lawyer like 5 already so another 5 tht cover plan b same day Iam tired of playing games with them |
| Mercaldo | Can you plz call me on a secure line ? |

Defendant began conducting visual surveillance of the residences and business of the victims on multiple occasions in January 2020, and sent pictures and videos of his surveillance to Mercaldo. *Id.* In some of the videos, defendant explained how he planned to attack J.C. *Id.* at 19. In two of the videos, defendant possessed a firearm while he was conducting the surveillance. *Id.*

Defendant and Mercaldo exchanged many other text messages concerning the plan to murder J.C. On January 10, 2020, for example, defendant stated, *id.* at 19: "Man i really want to run in store [sic] and kill his ass now." He also said: "Next opportunity i get Iam [sic] taken [sic.]" *Id.* at 20. That same day, after conducting further surveillance of J.C., defendant determined that the murder was a "two-man job[.]" *Id.* at 21. Accordingly, defendant texted another individual, B.R., to assist in the murder-for-hire plot. *Id.* Defendant planned on striking J.C. in the face with a baseball bat. *Id.* And, he told B.R. that he would pay him $250 to tell defendant when he saw J.C. coming. *Id.* at 21–22.

On January 11, 2020, defendant and Mercaldo exchanged the following messages, *id.* at 22:

| FROM | MESSAGE |
|------|---------|
| Gaither | Iam setting out his apartment later tonight Iam losing more money then making |
| Mercaldo | Chat plz ? |
| Gaither | Do you know wat time tail gate b over i don't want to just b driving East north and south |
| Mercaldo | Game starts at 8:20 so I'm guessing around 7:30.<br>But sometimes fat fuck goes to game afterwards |
| Gaither | Wat the hell Lmmfao Iam kill his ass man |
| Mercaldo | 👍 [thumbs up emoji sent by Mercaldo] |
| Mercaldo | Hope so !!! |

That same day, defendant went to J.C.'s place of business.  But, he did not carry out the plan because police officers were there.  *See id.* at 22–24.

Between January and May of 2020, defendant and the codefendant continued to exchange text messages regarding the plan to kill J.C.  *Id.* at 24–27.  These conversations were initiated by defendant on multiple occasions.  *See id.*  For example, as late as May 30, 2020, defendant sent the codefendant a photograph of J.C.'s place of business by text message and asked the codefendant "can u chat?", a phrase the two consistently used to mean talk on the phone.  *Id.* at 27.

Gaither was arrested in June 2020.  *See id.*  An examination of his phone revealed drug trafficking activity.  *Id.*  In particular, text messages revealed conversations with at least fourteen individuals relating to bulk drug transactions from January 2020 through June 2020.  *Id.*

During a search of defendant's home in June 2020, investigators recovered 732 pills marked as 30 milligram OxyContin.  *Id.* at 28.  Testing revealed that the purported OxyContin pills contained fentanyl and heroin.  *Id.*  Officers also recovered a loaded handgun and ammunition, as well as a permit to carry a handgun.  *Id.*

8

Defendant admitted that he knowingly possessed 70 grams of a mixture or substance containing a detectable amount of fentanyl and heroin with the intent to distribute it. *Id.*

The Plea Agreement states that the stipulation of facts established the commission of additional offenses to which defendant did not plead guilty. *Id.* ¶ 10(a). Under the Plea Agreement, pursuant to § 1B1.2(c) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), those additional offenses would be treated as if defendant had been convicted of those offenses. *Id.*

The Amended Presentence Report (ECF 110, "PSR") states, *id.* ¶ 73: "In this case, defendant has stipulated to additional offenses of Interstate Communication with Intent to Extort and the offense of Arson. As to Count Five and the relevant conduct charging an additional eleven threats, there are multiple victims. T[h]reats made to each victim have been grouped together, pursuant to USSG § 3D1.2(b). These groups do not group with Count One or the relevant conduct of Arson. The final offense level will be determined pursuant to USSG § 3D1.4."

According to the PSR, Group One contained Count One, the murder-for-hire conspiracy, which had a base offense level of 33. *Id.* ¶ 74. Because the offense involved the offer or receipt of anything for pecuniary value for undertaking the murder, four levels were added under 2A1.5(b)(1). *Id.* ¶ 75. The adjusted offense level was 37. *Id.* ¶ 79.

Group Two concerned relevant conduct, which was the arson. Under U.S.S.G. § 2K1.4(a)(1)(B), the offense involved the destruction of a dwelling and, therefore, the base offense level was 24. *Id.* ¶ 80. There were no adjustments. *Id.* ¶ 85.

Group Three concerned Count Five, interstate communications with intent to extort, in violation of 18 U.S.C. § 875(b). *Id.* ¶ 86. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level was 18. *Id.* Two levels were added under U.S.S.G. § 2B3.2(b)(1) because the offense involved an

express or implied threat of death. *Id.* ¶ 87. And, three levels were added under U.S.S.G. § 2B3.2(b)(3)(B)(i)(1) because the offense involved preparation to carry out a death threat. *Id.* ¶ 88. Therefore, the adjusted offense level was 23. *Id.* ¶ 92. The same analysis that applied to Group Three also applied to Groups Four through Fourteen. *See id.* ¶¶ 93–169. Thus, Groups Four through Fourteen each had an adjusted offense level of 23.

Group Fifteen corresponded to Count Sixteen, possession with intent to distribute fentanyl and heroin, in violation of 21 U.S.C. § 841. *Id.* ¶ 170. Because the offense involved at least 40 grams but less than 160 grams of fentanyl, the base offense level was 24, under U.S.S.G. §§ 2D1.1(a)(5) and (c)(8). *Id.*

Group One had the highest offense level, so it was assigned one unit. *Id.* ¶ 176. Because Groups Two through Fifteen had an offense level nine or more levels less than Group One, they were disregarded under U.S.S.G. § 3D1.4. *Id.* Accordingly, defendant had a combined adjusted offense level of 37. *Id.* ¶ 179. After deductions for acceptance of responsibility, defendant had a final offense level of 34. *Id.* ¶ 181–183. And, because defendant had no prior criminal history, he had a Criminal History category of 1. *Id.* ¶ 186. Defendant's Guidelines called for a sentence ranging from 151 to 188 months of imprisonment. *Id.* ¶ 210.

At sentencing on January 1, 2022 (ECF 107), defendant was 31 years of age. *See* ECF 110 at 3. As noted, the Court imposed a total sentence of 144 months of incarceration, with credit for time served since June 30, 2020. ECF 13; ECF 108.[4] Defendant was also ordered to pay restitution of $353,340.66. ECF 108 at 6.

---

[4] It appears that defendant was arrested on June 23, 2020. *See* ECF 110 at 2. Therefore, he may be entitled to credit from that date.

Defendant is now 33 years of age.  *See* ECF 110 at 3.  He is presently incarcerated at FCI Butner Low, located in Butner, North Carolina.  https://www.bop.gov/inmateloc/ (search by BOP Register Number 02573-509) (last accessed September 6, 2024).  He has served approximately 50 months of his 144-month sentence, or approximately 35 percent.  Gaither has a projected release date of September 14, 2030.  https://www.bop.gov/inmateloc/.

## I. Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Moody*, ___ F.4th ___, 2024 WL 3881520, at *3 (4th Cir. Aug. 21, 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  It is commonly termed the "'compassionate release exception.'"  *Moody*, 2024 WL 3881520, at *3; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release . . . .").

Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the BOP rarely filed such a motion on an inmate's behalf. As a result, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

However, with the passage of the First Step Act ("FSA") in 2018, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582, *Malone*, 57 F.4th at 173, by enabling a federal inmate to file a motion for compassionate release directly with the court, as long as the inmate first exhausted administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020). In particular, the FSA authorized a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request

12

by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.

The first step actually consists of two parts. The court "must determine: 1) whether extraordinary and compelling reasons warrant . . . a [sentence] reduction; and 2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *see Moody*, 2024 WL 3881520, at *4; *Davis*, 99 F.4th at 653; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).

If that first step is met, the court then proceeds to the second step. Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see Moody*, 2024 WL 3881520, at *4; *Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647; *Kibble*, 992 F.3d at 330. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*); *see Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons warrant a sentence reduction and that a

reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647.  Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54.  The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").  "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners.  *Davis*, 99 F.4th at 654; *see McCoy*, 781 F.3d at 281.  The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added).  Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts."  *Id.* (citation omitted).  As a result, district courts were "empowered

. . . to consider any extraordinary and compelling reason for release that a defendant might raise.'"
*Id.* at 284 (citation omitted).

However, effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is now applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction"). As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

(B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

　　(1) (A) extraordinary and compelling reasons warrant the reduction; or

　　(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

　　(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

　　(3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency . . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, § 1B1.13(b)(4)(A), (B); for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." § 1B1.13(b)(5).

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment

16

to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[5]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant. It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. That section provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a)

---

[5] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500. However, the Court acknowledged that "Congress or the Constitution [may] limit[] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence . . . ." *Id.* at 486. "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495. It follows that, because the Policy Statement is now applicable to prisoner-filed motions for compassionate release, a court may consider intervening changes of law only in the manner that the Policy Statement prescribes.

factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion). Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at 656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said: "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis." But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam). In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190). And, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant

actually received and the sentence he would receive, if sentenced under current law. *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."); *see Moody*, 2024 WL 3881520, *5–6 (recognizing that a defendant may not "challenge the validity of a sentence in a compassionate release" motion but explaining that a court may consider whether a defendant's sentence would be shorter "because of changes in the law."). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . . " *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th 647, is illustrative. The *Davis* Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 654–55. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661. According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)). The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (*citing Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).

## II.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[6]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).[7]  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.  *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it,

---

[6] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Philibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in June 2024 to reflect the most current data. *See People with Certain Medical Conditions and COVID-19 Risk Factors*, CTRS. FOR DISEASE CONTROL & PREVENTION (June 24, 2024), https://perma.cc/P8QQ-4AUF.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, and pulmonary hypertension; cystic fibrosis; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; hemoglobin blood disorders; HIV; being immunocompromised; liver disease; mental health conditions; having a BMI of 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions and COVID-19 Risk Factors*, *supra*, https://perma.cc/P8QQ-4AUF.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, a person's "risk of severe illness from COVID-19 increases as the number of [the person's] underlying medical conditions increase[]." *People with Certain Medical Conditions and COVID-19 Risk Factors*, *supra*, https://perma.cc/P8QQ-4AUF.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing."  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020),

https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 461 F. Supp. 3d at 248.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

There is no cure for the coronavirus. But, medical therapies have continued to improve, and vaccines are now generally available. *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W. Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of an illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020. And, the virus, too, has changed repeatedly, with multiple strains and variants. As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States. Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022). He stated: "The pandemic is

over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent. *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated August 31, 2024). Available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated March 26, 2024). But, a new "summer covid wave" has emerged, leading "[c]oronavirus activity in wastewater [to] reach[] levels considered 'high' or 'very high' in 26 states."  Fenit Nirappil & Lizette Ortega, *Covid Summer Wave Spreads Across U.S., Even Infecting Biden*, Wash. Post (July 18, 2024), https://perma.cc/JC8B-29AR.

### III.  Discussion

### A.

Defendant has submitted a letter from the Warden dated September 14, 2022, denying his request for compassionate release.  ECF 115-1.  The government does not contest administrative exhaustion.  Accordingly, I am satisfied that defendant has established administrative exhaustion. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Muhammad*, 16 F.4th 126, 129–30 (4th Cir. 2021)

28

(stating that, because the administrative exhaustion requirement is non-jurisdictional, it can be waived if not timely raised by the government).

**B.**

In the Motion, defendant advances several grounds to support his claim of extraordinary and compelling circumstances that warrant compassionate release. In particular, he cites his medical conditions, generally, and the potential for COVID-19 to cause serious harm or death to him because of those conditions. ECF 115 at 2.

As to defendant's health conditions, he contends that he suffers from spontaneous heart attacks, which began in 2014. *Id.* ¶ 7. He also contends that he has coronary artery disease, which has worsened since his incarceration. *Id.* (citing ECF 115-2). Further, he asserts that his heart condition is "compounded by dyslipidemia, hypertension, Type I diabetes, exertional angina and asthma." ECF 115, ¶ 7 (citing ECF 115-2).

According to defendant, the BOP "simply cannot provide [him] with adequate medical care." ECF 115, ¶ 11. He asserts that he was not provided his medication for eight days in November 2022, while he was in the Segregation Housing Unit ("SHU"), and that he suffered "a mild heart attack" as a result. *Id.* Defendant advances an additional argument in the Motion to Expedite. He argues that since he filed the Motion, he suffered a seizure "that nearly cost him his life due to inadequate care at FCI Butner." ECF 128-1 at 1.

In the Opposition, the government does not dispute that defendant suffers from the medical conditions mentioned above. *See generally* ECF 122 at 14–18. Nevertheless, the government contends that defendant has not established an extraordinary and compelling circumstance for his release. *Id.* at 14. According to the government, defendant's medical conditions existed at the time of sentencing, and the Court took them into account. *Id.* at 15; *see* ECF 125 (Sentencing Tr.)

at 53–55.  In contrast, argues the government, compassionate release concerns circumstances that "'could *not* have reasonably been foreseen at the time of sentencing.'"  ECF 122 at 15 (citation omitted) (emphasis in ECF 122).

The government also argues that a "generalized fear" of contracting COVID-19 is not sufficient to justify compassionate release, especially where, as here, defendant has "received a full complement of the COVID-19 vaccine."  *Id.* at 16.  Further, the government posits that as of June 2023, there were only "two positive cases of COVID-19" at FCI Butner, and only "18 inmate or staff deaths from COVID-19 at the facility since the start of the pandemic."  *Id.* at 18 (citing *COVID-19 Update*, Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_statistics.html).  According to the government, these numbers are "encouraging," because there were over 3,100 inmates at the Butner complex at that time.  ECF 122 at 18.

The government also disagrees with "defendant's claim that the BOP cannot care for his conditions[.]"  *Id.* at 15.  Citing defendant's medical records, the government contends that "defendant is receiving a prescription regimen for all of his conditions, that the regimen is being adjusted periodically to account for changes to the defendant's medical condition, and that his medical care is more than appropriate."  *Id.* (citing ECF 124-3).  Similarly, the government argues that defendant's claim that he suffered a heart attack and was not provided with medical care "is unsupported by any reliable evidence, and not documented in any way in the defendant's BOP medical records."  ECF 122 at 16.

Under section 1B1.13(b)(1) of the Guidelines, entitled "Medical Circumstances of the Defendant," an extraordinary and compelling reason for compassionate release exists if:

> **(A)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life

expectancy (i.e., a probability of death within a specific time period) is not
required. Examples include metastatic solid-tumor cancer, amyotrophic
lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
**(B)** The defendant is--

> **(i)** suffering from a serious physical or medical condition,
> **(ii)** suffering from a serious functional or cognitive impairment, or
> **(iii)** experiencing deteriorating physical or mental health because of
> the aging process, that substantially diminishes the ability of the
> defendant to provide self-care within the environment of a
> correctional facility and from which he or she is not expected to
> recover.

**(C)** The defendant is suffering from a medical condition that requires long-
term or specialized medical care that is not being provided and without
which the defendant is at risk of serious deterioration in health or death.
**(D)** The defendant presents the following circumstances--

> **(i)** the defendant is housed at a correctional facility affected or at
> imminent risk of being affected by (I) an ongoing outbreak of
> infectious disease, or (II) an ongoing public health emergency
> declared by the appropriate federal, state, or local authority;
> **(ii)** due to personal health risk factors and custodial status, the
> defendant is at increased risk of suffering severe medical
> complications or death as a result of exposure to the ongoing
> outbreak of infectious disease or the ongoing public health
> emergency described in clause (i); and
> **(iii)** such risk cannot be adequately mitigated in a timely manner.

Defendant's medical records reflect that he suffers from asthma, coronary artery disease,

heart disease, Type I diabetes, dyslipidemia, hypertension, hyperlipidemia, and exertional angina.

*See*, *e.g.*, ECF 115-2 at 1 (July 20, 2022, BOP "Consultation Report"); ECF 124-3 at 9 (December

20, 2022, BOP "Clinical Encounter" report); *id.* at 104 (March 15, 2022, BOP "Clinical Encounter

– Administrative Note"); *id.* at 183 (BOP "Health Problems" report generated February 27, 2023);

*id.* at 205 (March 30, 2022, BOP "Dental Health History Screen").  Defendant is prescribed

numerous medications, including nitroglycerin, lisinopril, insulin, and verapamil.  ECF 124-3 at

7.

According to the PSR (ECF 110), defendant was diagnosed with diabetes at age fifteen.

*Id.* ¶ 197.  When defendant was approximately twenty-four years old, he was diagnosed with high

blood pressure and high cholesterol. *Id.* Moreover, defendant had a heart attack (myocardial infarction) in 2014 and another heart attack in 2018, both of which required hospitalization. *Id.*; *see* ECF 125 at 54–55. As a result of the heart attacks, defendant now has two stents. ECF 110, ¶ 197; *see also* ECF 104-20 (presentencing letter of January 2021 from Anthony Gerard, M.D., identifying five of defendant's health conditions that pose a "significant risk" to defendant from COVID-19). Notably, defendant's father died of a heart attack in 2007, at the age of 37. ECF 110, ¶¶ 190, 195.

The government does not contest that defendant suffers from the medical conditions mentioned above. *See* ECF 122 at 15. But, it asserts that defendant's health conditions were thoroughly presented to and considered by the Court at sentencing, and therefore may not be considered in connection with the Motion. *Id.* (citing ECF 124-2 at 53–62; ECF 104 at 9–11). It maintains that "there is nothing about the defendant's conditions that were not already known at sentencing" and "'[t]he purpose of compassionate release is to reduce a term of imprisonment for extraordinary or compelling circumstances that could *not* have reasonably been foreseen at the time of sentencing.'" ECF 122 at 15 (quoting *United States v. Lake*, 2019 WL 4143293, at *4 (E.D. Ky. Aug. 30, 2019) (emphasis in ECF 122)).

To be sure, the defense thoroughly addressed defendant's health conditions at sentencing. In the defense's sentencing memorandum (ECF 104), for example, defense counsel stated: "Mr. Gaither has significant health problems that will cause additional hardship at the BOP than other inmates may experience." *Id.* at 9 (emphasis omitted).

And, the Court certainly took defendant's health into consideration in imposing the sentence. At sentencing, I noted, *inter alia*, that defendant's health conditions were "serious." ECF 125 at 53–55. Moreover, I recommended that defendant be imprisoned at FMC Butner, a

medical facility.  I explained, *id.* at 60–61: "I want to recommend Butner, North Carolina medical facility.  And I want to express strongly how much I believe that is appropriate.  So, I really, really want to convey and ask the, perhaps the probation agent and even the government [to] let the [BOP] know that this isn't a fly-by-night request.  I want to make sure nothing happens to this defendant.  And he has the kind of condition that I'm not in a position to say can be handled just anywhere.  There's no margin for error here when it comes to your heart.  So he needs to be taken care of.  So that's why I'm recommending Butner."

Contrary to the government's position, the fact that defendant's medical conditions were known at the time of sentencing does not foreclose a finding that they constitute an extraordinary and compelling circumstance.  After the government filed its Opposition (ECF 122), the Guidelines were amended, effective November 1, 2023.  U.S.S.G. § 1B1.13(e) is titled: "Foreseeability of Extraordinary and Compelling Reasons."  It provides:

> For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment.  Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

This Court must construe the words of the Sentencing Guidelines in accordance with their ordinary meaning.  *See United States v. Boler*, ___ F.4th ___, 2024 WL 3908554, at *5 (4th Cir. Aug. 23, 2024); *United States v. Haas*, 986 F.3d 467, 480 (4th Cir. 2021).  In my view, defendant has established that he is "suffering from a serious physical or medical condition[.]"  U.S.S.G. § 1B1.13(b)(1)(B)(i).

The Federal Correctional Complex ("FCC") at Butner consists of four different facilities: FCI Butner Low (where defendant is housed); FCI Butner Medium I; FCI Butner Medium II; and FMC Butner.  *Our Locations*, BUREAU OF PRISONS, https://www.bop.gov/locations/list.jsp.  But, it

does not appear that defendant is housed at the medical facility.[8]  This circumstance is of concern to the Court.

Several of defendant's medical conditions place him at an increased risk of severe illness from COVID-19.  As explained, defendant suffers, *inter alia*, from Type I diabetes, coronary artery disease, asthma, and hypertension.  ECF 115-2 at 1; ECF 124-3 at 9, 11, 104, 205.  Defendant also has a body mass index ("BMI") of 28.6. ECF 115-2 at 3.  The CDC identifies Type I diabetes, coronary artery disease, asthma, and a BMI of over 25 as conditions or diseases that can "make you more likely to get very sick from COVID-19."  *People with Certain Medical Conditions and COVID-19 Risk Factors*, *supra*, https://perma.cc/P8QQ-4AUF.  The CDC also states that high blood pressure (hypertension) can "possibly" make an individual more likely to get very sick because of the virus.  *Id.*  Moreover, the CDC states that a person's "risk of severe illness from COVID-19 increases as the number of . . . underlying medical conditions increases."  *Id.*

However, as of September 10, 2024, there were only two COVID-19 cases at FCC Butner. *Inmate COVID-19 Data*, BUREAU OF PRISONS, https://perma.cc/UXB6-U5LB.  Given the minimal number of positive COVID-19 cases at FCC Butner, I cannot find an extraordinary and compelling circumstance for compassionate release grounded in COVID-19.[9]  Nevertheless, this does not alter my conclusion that defendant's health conditions, standing alone, render him eligible for compassionate release.

---

[8] The Judgment merely recommends "FCC at Butner."  ECF 108 at 3.

[9] On the other hand, I disagree with the government that because Gaither has received the COVID-19 vaccine and booster shots (ECF 124-3 at 188), his risk of "contracting and suffering serious complications from COVID-19" is no longer a concern.  ECF 122 at 18.  The protection derived from the vaccine does not appear to last indefinitely.  And, as Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

Defendant also claims that an extraordinary and compelling reason exists because he "cannot receive . . . adequate medical attention for his numerous health conditions, including preventing another heart attack." ECF 115, ¶ 10. He provides the following example, *id.* ¶ 11: "[O]n November 21, 2022 Mr. Gaither was transferred to the [SHU] due to an [sic] disproven claim he violated BOP Offense Code 116. During his 44 day time in the SHU, Mr. Gaither suffered a mild heart attack due to failing to receive his required medication of nitroglycerin. Mr. Gaither was in [a] small cell with another unvaccinated inmate, Derrick Mitchell. Mr. Mitchell will testify to not only Mr. Gaither's heart-attack but also that despite repeated attempts to call for medical assistance, there was no response [from] any prison staff for several hours." Further, defendant contends: "Dr. Benjamin Dubois, of Woodholme Cardiovascular Associates . . . affirmed Mr. Gaither's medical needs are best met under specialized care that prison cannot provide." *Id.* ¶ 10.

The government argues that defendant's claim that he suffered a heart attack and was not provided with adequate care "is unsupported by any reliable evidence, and not documented in any way in the defendant's BOP medical records." ECF 122 at 16.

U.S.S.G. § 1B1.13(b)(1)(C) provides that an extraordinary and compelling circumstance exists where "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." On the record before me, I cannot conclude that the BOP has failed to provide defendant with necessary and adequate medical care.

Defendant's medical records of December 20, 2022, reflect that defendant told a medical provider that "it took 8 days while he was in the SHU before he got his medication. Did have CP [chest pain] when off his BP [blood pressure] medications, has gone away since he got his medications back[.]" ECF 124-3 at 10; *see also* ECF 124-3 at 9 (physician note from December

35

20, 2022, stating that defendant said "he was out of his medications for 8 days and had chest pains, got the medicine back and pains have gone away").

Another document, titled "Bureau of Prisons Psychology Services SHU Review," indicates that defendant was in the SHU on December 12, 2022. *Id.* at 211. It reflects that defendant was "housed in the Complex SHU for 113 - Possession of Alcohol." *Id.* However, that document does not mention that defendant complained about a lack of medication or chest pain. *See id.*

To be sure, placement in SHU does not relieve the BOP from providing a prisoner with prescribed medication or necessary medical care. Nevertheless, defendant's assignment to the SHU appears to be an isolated occurrence. Based on what has been submitted, I cannot determine what occurred with regard to defendant's medical care while he was in the SHU. For example, the medical records indicate that defendant reported "chest pain." ECF 124-3 at 9, 10. Yet, defendant claims in the Motion that he suffered a "mild heart attack." ECF 115, ¶ 10.

In the Motion to Expedite, defendant also asserts: "Medical records through January 19, 2024 reveal that Mr. Gaither was recently prescribed an incorrect dosage of Ozempic to control his diabetic condition and poor heart health. This medication error resulted in a near-fatal seizure, during which Mr. Gaither was found disoriented and immobile in his bed." ECF 128-1 at 1. Further, he contends that medical staff responded "dangerously slow[,]" which "further prolonged his risk of mortality." *Id.* at 2. According to defendant, the "medical staff later acknowledged that an error was made in the prescribed dosage of Ozempic which could have killed Mr. Gaither." *Id.*

Moreover, Gaither argues that the Ozempic "incident starkly illustrates the life-threatening consequences of inadequate medical care in BOP custody and lends urgency to Mr. Gaither's request. Each day that passes without resolution of his motion places Mr. Gaither at further risk of serious harm or death due to medical neglect." *Id.* But, defendant has not provided any

documentation establishing that he experienced a seizure due to receipt of an incorrect dosage of Ozempic.

According to defendant's medical records, he is regularly evaluated and undergoes lab tests. *See, e.g.*, ECF 124-3 at 5, 11, 57–61.  Apart from when defendant was in the SHU, he has not identified any instance when he did not receive his medication.[10]  To the contrary, defendant's voluminous BOP medical records establish that he is receiving a prescription regimen for his medical conditions, which is adjusted periodically as the need arises.  *Id.* at 4–5, 7–8, 145–165, 195–204, 208.

Gaither asserts that "Dr. Benjamin Dubois, of Woodholme Cardiovascular Associates . . . affirmed Mr. Gaither's medical needs are best met under specialized care that prison cannot provide."  ECF 115, ¶ 10.  However, defendant has not submitted any documentation of Dr. Dubois's recommendation.

In sum, defendant's allegations do not establish that the medical care he requires "is not being provided," as is necessary to establish an extraordinary and compelling circumstance under U.S.S.G. § 1B1.13(b)(1)(C).

---

[10] Defendant's medical records state that he went without insulin for "a couple weeks at a time before getting to Butner so BG was high."  ECF 124-3 at 57.  Similarly, his records state: "Inmate came from another institution today and did not have insulin until now."  *Id.* at 99.  But, defendant does not contend that he has not received insulin while at Butner.

**C.**

I have concluded that defendant's serious medical issues render him eligible for compassionate release. But, that does not end the inquiry. I must next consider the sentencing factors enumerated in 18 U.S.C. § 3553(a), to determine if compassionate release is appropriate.

Defendant's crimes are extremely serious. The factual stipulation, some eighteen pages in length, provides a detailed description of horrifying, prolonged conduct of defendant and the codefendant that far exceeded mere "tough talk." Defendant participated in a murder-for-hire plot and took substantial steps to effectuate the plan. He terrorized J.C., K.D., and their families for months with stalking and threats. He smashed J.C.'s car window in the middle of the night. ECF 96 at 13. Then, he set J.C.'s house on fire, also in the middle of the night, which caused hundreds of thousands of dollars of damage to the home and forced J.C. and his wife to move out of the house for almost a year. *Id.* at 15. Miraculously, no one was physically injured. But, the emotional trauma that was inflicted cannot be quantified. As a result of defendant's conduct, one of the victims suffers from PTSD and must now take daily medication for anxiety. ECF 110, ¶ 68.

Moreover, defendant was involved in drug distribution. He distributed pills marked as OxyContin, which also contained heroin and fentanyl, both of which are highly dangerous. ECF 96 at 28.

Although defendant had no prior criminal convictions when he appeared for sentencing, and he has serious health issues, the gravity of his conduct cannot be overlooked. This was not a case with an isolated error of judgment. Defendant sent threatening messages and trafficked drugs for substantial periods of time. As to the threats, defendant engaged in a consistent course of conduct for approximately one year. And, the evidence found on defendant's phone indicated drug trafficking activity going back at least three years. *Id.* at 27.

To be sure, rehabilitation efforts after sentencing must be considered in regard to a motion for compassionate release. *See United States v. Lancaster*, 997 F.3d 171, 175 (4th Cir. 2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). However, rehabilitation alone does not warrant a defendant's immediate release. *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022).

In other words, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 334 n.3. The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *McDonald*, 986 F.3d at 412; *see Martin,* 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts). Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

Defendant's post-sentencing conduct weighs in his favor. Defendant has completed seventeen educational courses, including drug education, and obtained his GED while in BOP custody. ECF 115-4. Defendant is also a "Unit Head Manager," which demonstrates that he has some leadership skills and is trusted at FCI Butner Low. ECF 128-1 at 4. Further, defendant claims that he has "taken on mentorship roles, tutoring fellow inmates and encouraging them to make positive choices and further their education." *Id.* These achievements are praiseworthy.

Curiously, in the Motion to Expedite, defendant asserts that while in BOP custody, he "has maintained an exceptional disciplinary record, with only four minor infractions in 17 years and none since July 2014." ECF 128-1 at 4. But, defendant was not arrested until approximately June 23, 2020. ECF 13; ECF 110 at 2. And, as of July 25, 2022, he had zero infractions, according to his BOP disciplinary records. ECF 115-3.

Notably, defendant was housed in the SHU for "Possession of Alcohol" in November and December of 2022. ECF 124-3 at 9, 10, 211. But, defendant asserts that he "disprove[d]" the claim that he possessed alcohol. ECF 115, ¶ 11.

In the Motion to Expedite, defendant argues that the case of *United States v. Van Putten*, ___ F. Supp. 3d ___, No. 04 CRIM. 803 (GBD), 2024 WL 1332024 (S.D.N.Y. Mar. 27, 2024), is new legal authority that provides "compelling support" for his Motion. ECF 128-1 at 2. In that case, the defendant was a 50-year-old inmate who was convicted of murder while engaged in a narcotics conspiracy, for which he received a life sentence. *Van Putten*, 2024 WL 1332024, at *1. After about nineteen years in prison, the defendant filed a motion for compassionate release, arguing that: (1) the sentencing court relied on a mistaken belief regarding the frequency of life sentences for federal defendants convicted of murder, (2) there was a sentencing disparity between the defendant and his codefendants, (3) there were changes in the brain science relating to how age

40

affects criminal responsibility, and (4) his rehabilitation while incarcerated favored a sentence reduction. *Id.* The court agreed and reduced the defendant's life sentence to thirty years. *Id.* at *10.

Gaither argues that there are "striking parallels" between *Van Putten* and this case. ECF 128-1 at 2. I disagree.

The court in *Van Putten* agreed with the defendant that the sentencing court's "mistaken belief" as to the frequency of life sentences for defendants convicted of intentional murder was of "serious gravity." *Van Putten*, 2024 WL 1332024, at *6. Defendant argues that, like the sentencing court in *Van Putten*, this Court "relied on an erroneous assumption about the typicality of life sentences for his offense." ECF 128-1 at 3. That contention is belied by the sentencing transcript. The Court made no mention of life sentences for the crimes of which defendant was convicted here. *See generally* ECF 125; *see also* ECF 109 (Statement of Reasons). To the contrary, the plea was entered under Rule 11(c)(1)(C), by which the parties agreed to a sentence ranging from 132 to 156 months of incarceration.

Defendant also claims that, like the defendant in *Van Putten*, there is a sentencing disparity between himself and his codefendant. ECF 128-1 at 5. One of the sentencing factors, 18 U.S.C. 3553(a)(6), addresses "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." According to defendant, "[w]hile acknowledging that [defendant] was not the principal perpetrator of the murder[-for-hire plot], the government fails to justify why he received the harshest sentence of all involved parties." ECF 128-1 at 5.

The claim is without merit.  Gaither's codefendant was never sentenced; Mercaldo died in December 2021, prior to sentencing.  *See* ECF 113; ECF 114.[11]

Moreover, defendant argues that the *Van Putten* Court "recognized [that] the defendant's young age (21) at the time of the offense [w]as a mitigating factor, citing evolving perspectives on youth culpability."  ECF 128-1 at 3.  Studies show that the frontal lobe of the male brain may not be fully developed until about the age of thirty-five.  *Van Putten*, 2024 WL 1332024, at *9 (quoting Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1.) ("[T]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."). Therefore, defendant "argues that the Court should still consider his relatively young age in light of current scientific understanding of brain development and decision-making in adults under 30." ECF 128-1 at 3.

The *Van Putten* Court explained that the risk of poor decision making because of youth is "amplified in high-pressure, time-sensitive, emotional contexts (also referred to as 'hot cognition')

---

[11] On August 5, 2021, Mercaldo pled guilty to Count One, charging conspiracy to use interstate commerce facilities with the intent to commit a murder-for-hire, and Count Five, charging transmission of interstate communications with threats to injure.  ECF 88.  The guilty plea was entered pursuant to a Plea Agreement.  *See* ECF 89.  Each side reserved the right to advocate for a reasonable sentence.  *Id.* ¶ 13.  Mercaldo's final offense level was 34, and he had a criminal history category of 1.  ECF 99 (Presentence Report), ¶¶ 105, 109.  Like Gaither, Mercaldo's Guidelines called for a sentence ranging from 151 to 188 months of imprisonment.  *Id.* ¶ 139.

or if peer pressure is being imposed." *Van Putten*, 2024 WL 1332024, at *9 (citations and internal quotations omitted). And, in that case, the court highlighted that the events "reflect a situation in which Defendant was subject to hot cognition." *Id.*

The same cannot be said for Gaither. In marked contrast to the defendant in *Van Putten*, Gaither engaged in a protracted course of escalating conduct over a one-year period. The factual stipulation undermines any contention that Gaither's actions were somehow a product of peer pressure or the result of hot cognition. Indeed, at sentencing, defendant's attorney asserted that defendant was motivated by financial gain, not that he was subject to peer pressure. ECF 125 at 42–43; *see also* ECF 105 at 4.

Moreover, Gaither was born in November 1990. ECF 110 at 3. He was about twenty-nine years old when he committed the offenses. Defendant was old enough to know that his conduct was egregious. And, he had ample time to decide that he was on the wrong path.

Defendant also cites *United States v. Griffin*, ELH-12-003, 2021 WL 6064856 (D. Md. Dec. 22, 2021), in support of his Motion. ECF 115, ¶ 19. *Griffin* is also inapposite. There, the defendant was a career offender under U.S.S.G. § 4B1.1, and he was sentenced to 151 months of imprisonment for a Hobbs Act robbery. *Id.* at *1, 2. After the defendant was sentenced, the Fourth Circuit held that "'Hobbs Act robbery is not a crime of violence under the career offender provision of the Sentencing Guidelines.'" *Id.* at *16 (quoting *United States v. Green*, 996 F.3d 176 (4th Cir. 2021)). Therefore, I determined that, if the defendant were "sentenced today, he would not qualify as a career offender." *Id.* at *16. In my view, this change in the law weighed in favor of a sentence reduction, because the defendant had already served 105 months of imprisonment—more than two years longer than the high-end of the correct Guidelines range. *Id.* The Court is not aware of any similar change in the law with respect to Gaither's case, and he has not identified one.

In addition, defendant cites *United States v. Perez*, No. 3:02CR7 (JBA), 2021 WL 837425 (D. Conn. Mar. 4, 2021). *Perez*, too, is distinguishable. There, the defendant was convicted, *inter alia*, of conspiracy to commit interstate murder-for-hire, for which he received a life sentence. *Id.* at *1. The defendant filed a motion for compassionate release after serving twenty-three years of his sentence. *Id.* The court granted the motion. Notably, the government agreed with the defendant that he did not present a danger to the public. *Id.* at *6. The court observed that "this case uniquely stands out because the two former Assistant United States Attorneys who prosecuted Defendant's case wrote an unsolicited letter to the Court sharing their view that 'life behind bars is too harsh a sentence' for [the Defendant], supporting Defendant's request for the Court to consider reducing his sentence in light of the fact that his conduct was not the 'moving force behind the murder.'" *Id.* at *5.

*Perez* stands in marked contrast to this case. There, the defendant received a life sentence, whereas Gaither received a twelve-year sentence. And, the defendant in *Perez* served twenty-three years, not a mere four years and three months.

Under the Guidelines, the Court must be satisfied that the defendant is not a danger to the safety of "any other person or to the community[.]" U.S.S.G. § 1B1.13(a)(2). Defendant has an exemplary disciplinary record while in BOP custody, which is a factor to consider in determining whether he remains a danger to the public. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

Defendant also claims that he "will not pose a danger to any community as supported by his comprehensive release plan. This plan includes residing with his mother, Ms. Latarsha Murphy in Baltimore[,] Maryland, participating [in] rehabilitating community functions at her church, personal mentorship of trouble[d] teens, employment with his Aunt, Ms. Dawn Smith at All-In-One Inc., and ongoing support from religious leaders to ensure his successful reintegration into the

community." ECF 115, ¶ 17 (citing ECF 115-5).  The Court appreciates that defendant has made arrangements for gainful employment and a place to reside if he were to be released.  However, "[e]very inmate moving for compassionate release is expected to provide a release plan[.]"  *United States v. Edwards*, No. CR 03-234, 2022 WL 2866703, at *6 (D.D.C. July 21, 2022) (citing 28 C.F.R. § 571.61(a)(2)).

Moreover, defendant agreed to murder someone for a few thousand dollars.  ECF 96 at 18. And, he took steps to do so.  He set a victim's house on fire during the night.  And, as explained, defendant did not act in the heat of passion.  Instead, he engaged in a consistent course of escalating conduct for over a year, in which he terrorized two people and their families.

Defendant's sentence, which was in the middle of the C plea range and below the bottom of the Guidelines, was reasonable, if not lenient.  And, he has only served about 35% of that sentence.  As I see it, a reduction of defendant's sentence at this time would seriously undermine respect for the law.

The Court is mindful that defendant's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction."  *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").  The Court is also mindful that, although defendant has moved for his immediate release, I may reduce his sentence instead.  *See, e.g.*, *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020) (the First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in

its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'").

But, in the context of this case, a sentence reduction is premature.

### IV.  Conclusion

For the foregoing reasons, I shall deny defendant's Motion (ECF 115), without prejudice.

And, I shall deny the Motion to Expedite (ECF 128), as moot.


An Order follows, consistent with this Memorandum Opinion.


Date: September 27, 2024                          _____/s/_____

                                                  Ellen Lipton Hollander
                                                  United States District Judge

46